Thomas L. FAWICK and Marie Fawick, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 20165.

United States Court of Appeals, Sixth Circuit.

Jan. 7, 1971.

Carolyn R. Just, Dept. of Justice, Washington, D. C., for respondent-appellant; Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, William A. Friedlander, Attys., Dept. of Justice, Washington, D. C., on brief.

Edward C. Crouch, Cleveland, Ohio, for petitioners-appellees; Arter & Hadden, Cleveland, Ohio, on brief.

Before PHILLIPS, Chief Judge, and WEICK and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

This case involves the issue of how income received from exploitation of a patent should be treated under the Federal income tax laws. Specifically, the issue on this appeal is whether or not an exclusive patent license having a field-of-use restriction is a transfer of "property consisting of all substantial rights to a patent" within the meaning of § 1235 of the Internal Revenue Code of 1954, 26 U.S.C. § 1235.

The Tax Court held that the exclusive license containing a field-of-use restriction in this case was a transfer of such property and that the income received thereunder was entitled to capital gains treatment pursuant to the provisions of § 1235. The Commissioner appeals. We reverse.

Our summary of the facts will be limited to those necessary for an understanding of the contentions raised by the parties and the disposition that we make of the issue presented. A complete statement of the facts appears in the opinion of the Tax Court reported at 52 T.C. 104. Reference may be had to that opinion for a more detailed factual recitation.

Mr. Fawick (the taxpayer) has been an inventor since sometime before 1926 and has been issued some 200 patents during his lifetime. His normal practice has been to exploit his inventions on his own rather than to license others to develop and market them.

Prior to 1928 the taxpayer was engaged in the business of manufacturing clutches in Racine, Wisconsin. He sold this business and moved to Akron, Ohio. While in Akron he visited various rubber plants and began to conceive the idea of a flexible brake, coupling and clutch with certain of the moving parts made of rubber. About 1936 he completed these inventions and made test models of his flexible coupling and clutch, utilizing the principle of a rubber gland inflated with air. Patent applications were filed on this invention and on February 23, 1937, the taxpayer entered into a license agreement with the Falk Corporation covering the inventions described in the applications. The agreement contained the following provisions:

> "*Whereas* Fawick is the owner of certain United States patent applications relating to assemblies suitable

for use in flexible couplings, driving clutches and power transmissions, the same being identified as follows:

Serial No. 99420 filed September 4, 1936

Serial No. 99421 filed September 4, 1936

Serial No. 101638 filed September 19, 1936, and

"*Whereas* Falk desires to obtain the hereinafter specified license to employ the inventions of the said patent applications,

"Now, therefore, for and in consideration of the provisions hereof and other good and valuable considerations, the parties hereto *Agree as Follows:*

"(1) Fawick hereby grants to Falk an *exclusive* license to make, to use, and to sell in the United States, its territories and possessions, and in the Dominion of Canada, *flexible couplings*, as distinguished from driving clutches and other forms of power transmissions, embodying any of the inventions of the above identified patent applications or any improvement thereon that may be owned, controlled, or subject to licensing by Fawick.

"(2) Fawick hereby grants to Falk an *exclusive* license to make, to use, and to sell in the United States, its territories and possessions, and in the Dominion of Canada, *but only for marine service*, one-to-one *driving clutches* embodying any invention of the above identified patent applications or any improvement thereon that may be owned, controlled, or subject to licensing by Fawick; and also a *non-exclusive* license to make, to use, and to sell such embodiments in the United States, its territories and possessions, and in the Dominion of Canada, but only as a part of *complete geared power transmission units* of Falk's manufacture.

"(3) Falk agrees to pay to Fawick Twenty-five Thousand Dollars ($25,000) upon the signing hereof and, in addition thereto on or before the 15th day of January, April, July, and October of each year, Falk shall pay to Fawick upon all flexible couplings made hereunder, and installed for use by Falk or delivered to the customer during the next preceding three calendar months, and embodying any invention of the above identified patent applications as defined by any pending claim thereof or by a claim or claims of letters patent issued upon any of them, a royalty of five percent (5%) of the amount of the net sales price of the couplings after trade discounts but before cash discounts; and upon all driving clutches made hereunder, and installed for use by Falk or delivered to the customer during the next preceding three calendar months, a royalty of seven percent (7%) of the amount of the net sales price of the clutches after trade discounts but before cash discounts." (Emphasis supplied.)

Supplemental agreements were executed between the taxpayer and Falk Corporation which are not pertinent to the issues involved on this appeal.

Rights under these patents also were granted to another corporation created by the taxpayer. In 1938 the taxpayer organized Fawick Corporation under the laws of Indiana to engage in the manufacture and sale of these clutches for other than marine use. As of December 30, 1938, he assigned to Fawick Corporation his rights in the patents, excluding the rights previously assigned to Falk Corporation in the above-quoted agreement and also excluding certain rights which he reserved to himself. In return for this assignment the taxpayer received all the stock of Fawick Corporation. Later, Fawick Corporation became publicly held, with its stock listed on the New York Stock Exchange. As of 1963, however, the taxpayer and his family owned slightly over fifty per cent of the stock of Fawick Corporation. During the years here in issue and prior thereto, Fawick Corporation manufactured clutches for industrial use in substantial quantities. Many thousands of flexible clutches were manufactured by Fawick Corporation under the taxpayer's patents for

various industrial uses, including oil field equipment and heavy metal stamping equipment. Neither the taxpayer nor Fawick Corporation ever manufactured any flexible clutches for marine use except that Fawick Corporation did some manufacturing by agreement with Falk during World War II, when Falk was unable to supply the defense demand for such clutches.

Returning to the above-quoted agreement between the taxpayer and Falk Corporation, we construe this document as granting to Falk:

(1) An exclusive license for the flexible couplings,

(2) An exclusive license for driving clutches but *limited to marine service only,* and

(3) A non-exclusive license for the complete geared-power transmission units.

The agreement also provided that patents covering improvements on the couplings and clutches were to be covered by the license. One such improvement patent (U.S. Letters Patent No. 2,662,-625) was issued to the taxpayer on December 15, 1953. The improvement embodied in this patent was used by the Falk Corporation during the tax years here in question (1961–63) with royalties thereon paid to the taxpayer under the agreement.[1] The royalties paid during the pertinent period for manufacture of the various devices are as follows:

| Year | Couplings | Marine Clutches |
|------|-----------|-----------------|
| 1961 | $2,167.40 | $5,386.66 |
| 1962 | 2,283.90 | 5,526.67 |
| 1963 | 2,383.43 | 4,295.69 |

The 1961 royalties paid for the manufacture of both couplings and clutches were reported by taxpayer and his wife on their joint income tax return as ordinary income. On their joint return for 1962 they reported all the royalties as long term capital gains. The Commissioner determined that the 1962 royalties paid for manufacturing marine clutches was ordinary income but did not change the method of reporting the royalties paid for manufacturing the couplings. The 1963 royalties paid were reported on the joint return as both ordinary income (that paid with respect to marine clutches) and long term capital gain (that paid with respect to couplings).

All the clutches manufactured by Falk Corporation during 1961–63 were incorporated as a part of a complete geared-power transmission unit and all such units were manufactured for marine service only.

The present controversy arose when the taxpayer petitioned for a redetermination of deficiencies as set forth by the Commissioner in his notice of deficiencies dated November 22, 1966. The deficiencies found by the Commissioner were a result of the treatment as long term capital gain of the royalties paid by Falk Corporation to taxpayer for the production of the marine clutches.

The Commissioner did not determine any deficiencies as a result of the long term capital gain treatment of the royalties paid for manufacture of the couplings. The taxpayer urges that by not finding a deficiency as a result of the capital gain treatment of royalties paid for manufacturing of the couplings, the Commissioner has taken a position inconsistent with that taken with respect to the royalties for manufacturing of the clutches. The taxpayer argues that the two should be treated the same (since the patent in question covers a number of articles in addition to couplings) and that by failing to claim a deficiency for the couplings, the Commissioner has rec-

---

1. The royalties were paid to taxpayer's wife pursuant to an assignment to her executed by the taxpayer. The Tax Court found, and the Commissioner does not challenge here, that the income in the hands of the donee wife has the same character that it would have had if it had been received by the donor husband. *See,* Reece v. Commissioner of Internal Revenue, 24 T.C. 187, aff'd, 233 F.2d 30 (1st Cir.). In this opinion, we will treat the case as if the royalties had been paid directly to the taxpayer.

ognized the right of the taxpayer to capital gain treatment for the clutches. On this appeal we are concerned only with the correctness of the challenged deficiencies, which involve royalties for the clutches. We express no opinion as to the tax treatment of royalties from the couplings.

The taxpayer's claim for redetermination was based on § 1235. His argument before the Tax Court was to the effect that (1) the royalties were paid under the exclusive, for-marine-service-only clause of the license and that (2) this clause was a transfer of "property consisting of all substantial rights to a patent," thus entitling the income generated thereunder to long term capital gain treatment. The Commissioner contested both these arguments, contending that (1) the royalties were paid under the non-exclusive, complete-geared-power-transmission-unit clause of the license, and that (2) even if the royalties were paid under the exclusive, for-marine-service-only clause, this clause did not effect a transfer of all substantial rights to a patent within the meaning and intent of the statute.

The Tax Court ruled in favor of the taxpayer on both points, and on this appeal the Commissioner alleges error in both instances. Because of the decision we make on the second of these points, we do not find it necessary to consider the first.

The determinative issue on this appeal is whether a patent license containing a field-of-use restriction is a transfer of "property consisting of all substantial rights to a patent" within the meaning of § 1235 of the Code. Section 1235 provides:

"(a) *General.*—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part

of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred."

1) Background of the 1954 Statute

A resolution of the issue presented on this appeal requires a consideration of the state of the law as it existed prior to the enactment of the 1954 Code. Before 1954 there was no I.R.C. section corresponding to the present § 1235.[2] Prior to 1954 the only way an inventor could get capital gain treatment for income received from exploitation of a patent was by qualifying under the sections corresponding to the present §§ 1202, 1221 and 1222. To qualify, the inventor must have been an "amateur" rather than a "professional." Otherwise, the sale would have been of property held primarily for sale in the ordinary course of his business and taxed as ordinary income. As a further qualification, some courts held that the payment had to be on a lump sum basis. Although a majority of the decisions did not adopt and apply this second requirement, some accepted it at the insistence of the Commissioner. It was the Commission's position prior to the enactment of § 1235 that the capital gain provisions of the Code were designed to lessen the tax burden on persons selling property for a gain, the gain having been produced over a period of years but realized in a single tax year, and that to qualify for the more favorable capital gain treatment now allowed under § 1235, the income would have to be realized in a single tax year, not over a pe-

---

2. In 1956, after enactment of the 1954 Code, Congress amended § 117 of the Internal Revenue Code of 1939 by inserting the language of § 1235. That amendment was discussed by the Supreme Court in United States v. Zacks. 375 U.S. 59, 84 S.Ct. 178, 11 L.Ed.2d 128, which reviewed the background and history of § 1235 in a different context.

riod of several years as in the usual patent royalty situation. For a clear statement of the Commissioner's argument and the reasons for rejecting it, see Dreymann v. Commissioner, 11 T.C. 153, 162–163, where the Court said:

"We do not agree with respondent's contention that to apply the benefits of the long term capital gain provisions to the amounts received from Grant in the years here involved would be repugnant to the 'underlying theory of the capital gains limitations.' He argues that the purpose of the capital gains limitations is to lessen the impact of the Federal income tax 'on the realization in one lump sum in one taxable year of an increment in value which had taken place over a number of years.' Since petitioner here did not sell the process for one lump sum, he concludes, the application of the capital gains limitations in the case at bar would defeat the intent and purpose of Congress. In the first place, section 117 of the Revenue Act of 1934 did not contain any provision to the effect that payment from the sale of a capital asset must be in one lump sum. Respondent supports his position, however, by pointing to House Report No. 350, 67th Cong., 1st sess. (C.B. 1939–1 (Part 2), p. 176). That report accompanied the Revenue Act of 1921, which first introduced the capital gains provision into our taxing statute. It reads in part as follows:

'Section 206: The sale of farms, mineral properties, and other capital assets is now seriously retarded by the fact that gains and profits earned over a series of years are under the present law taxed as a lump sum (and the amount of surtax greatly enhanced thereby) in the year in which the profit is realized. \* \* \*'

"See also C.B. 1939–1 (Part 2), p. 189, and S.Rept.No. 275, sec. 206.

"There is nothing in the House report or in the Senate report which supports respondent's assertion that a taxpayer, in order to have the tax benefit of the capital gains provisions must sell his asset for one lump sum. As a matter of fact, this and other courts have held that where, as here, the consideration for the sale of a capital asset was in the form of periodic payments based on a percentage of the gross sales made during the year, the taxpayer was entitled to a capital gains limitation on the sums received in each year. See Commissioner v. Celanese Corporation, [140 F.2d 339] *supra*; George James Nicholson, 3 T.C. 596, and cases cited therein. We can find no valid reason for holding otherwise in this case."

In Myers v. Commissioner, 6 T.C. 258, the Tax Court held in 1946 that an "amateur" inventor was entitled to capital gain treatment of royalty income even though the payments were contingent on production, i. e., in the form of royalties. The Commissioner published a non-acquiescence in that decision. The report of the Senate Finance Committee, 1954 U.S.Code Cong. & Ad.News 5080, 5082, contained the following:

"[I]n 1950 the prospect of continued litigation was engendered in this area by the issuance of Mimeograph 6490 (1950–1 CB 9), in which the Commissioner of Internal Revenue announced that he would thereafter regard such assignments or licenses as 'providing for the payment of royalties taxable as ordinary income' if payment is measured by the production, sale, or use of the property transferred or if it is payable periodically over a period generally coterminous with the transferee's use of the patent. *To obviate the uncertainty caused by this mimeograph* and to provide an incentive to inventors to contribute to the welfare of the Nation, your committee intends, in subsection (a), to give statutory assurance to certain patent holders that the *sale of a patent (whether as an 'assignment' or 'exclusive license') shall not be deemed not to constitute a 'sale or exchange' for tax purposes*

*solely on account of the mode of payment.*" (Emphasis added.)

### 2) Purpose of § 1235

From this review of the germination of § 1235, we conclude that the section was intended to assure inventors that their license royalties would be afforded capital gain treatment "regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred."

This preferred capital gain treatment is conditioned, however, upon the holder transferring property consisting of all substantial rights to the patent. The emphasis of the section, as we read it, is on the tax consequence of the "sale of a patent" where the consideration is in the form of contingent royalty payments and not on providing some special treatment as a result of the transfer of property consisting of all substantial rights to a patent. The "incentive to inventors to contribute to the welfare of the Nation" resulted when capital gain treatment was provided under § 1235 for "professional" as well as "amateur" inventors otherwise qualifying under the statute. Thus, the two-fold purpose of the section (i. e., to negate the effect of Mimeograph 6490 and to provide an incentive to inventors) does not point to the interpretation urged by the taxpayer, viz.: that the section was designed to permit capital gain treatment of income from transfers having a field-of-use restriction.

For tax purposes the normal business exploitation of patent property can be analogized to the business exploitation of any other capital assets. If a taxpayer rents a capital asset, the law treats the rental income as ordinary income, whereas, if he sells the asset and otherwise meets the statutory requirements, he gets capital gain treatment.

The reason for § 1235 is that even when patents are sold, the normal transaction involves periodic payments of the sale price "contingent on the productivity, use or disposition of the property transferred." This form of payment is so much like rental payments in the commonplace transactions involving other capital assets that Congress found it necessary to declare specifically that such transfers are entitled to capital gain treatment irrespective of the mode of payment.

### 3) What is "Property consisting of all substantial rights to a patent?"

Apparently Congress, in drafting § 1235, chose the phrase "transfer * * * of property consisting of all substantial rights to a patent" rather than "sale of a patent," since, due to the special character of a patent, the transferor must maintain some control over the property in order to get his maximum sale price from the transferee. Hence, Congress required only that the holder transfer "all substantial rights" to a patent rather than make a complete divestiture of title to the property.

The report of the Senate Finance Committee makes it clear, however, that the preferred treatment should be limited to transfers in the nature of a sale, in the sense that the transferor must release to the transferee all substantial rights evidenced by the patent, and that interpretation should prevail regardless of whether the transaction is termed an "assignment" or an "exclusive license".

"The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a 'sale or exchange' under existing law, with the exception noted relating to contingent payments, which exception is justified in the patent area for 'holders' as herein defined.

To illustrate, exclusive licenses to manufacture, use, and sell for the life of the patent, are considered to be 'sales or exchanges' because, in substantive effect, all 'right, title, and interest' in the patent property is transferred (irrespective of the location of legal title or other formalities of language contained in the license agreement). Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to 'use' the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to *determine whether or not substantially all rights of the owner in the patent property have been released to the transferee*, rather than recognizing less relevant verbal touchstones. The word 'title' is not employed because the retention of bare legal title in a transaction involving an exclusive license may not represent the retention of a substantial right in the patent property by the transferor. Furthermore, retention by the transferor of rights in the property which are not of the nature of rights evidenced by the patent and which are not inconsistent with the passage of ownership, such as a security interest (e. g., a vendor's lien) or a reservation in the nature of a condition subsequent (e. g., a forfeiture on account of nonperformance) are not to be considered as such a retention as will defeat the applicability of this section. On the other hand, a transfer terminable at will by the transferor would not qualify." (Emphasis added.) 1954 U.S.Code Cong. & Ad.News pp. 5082–5883.

With the above cited legislative history as background, it is our opinion that a two prong inquiry is necessary to determine if a transaction qualifies for special treatment under § 1235. The initial inquiry for determining whether or not there has been a transfer by the holder of "property consisting of all substantial rights to a patent" requires consideration of what the holder has left after the transfer. If he retains any substantial rights to the patent, then he has not transferred the property that comprises all those rights.

If the taxpayer can show that he has no substantial rights in the patent after the transfer, as a second inquiry we must look at what he actually relinquished to the transferee. It is our opinion that the phrase "all substantial rights to a patent" is a reference to the monopoly right for which the patent stands. The monopoly right granted by the patent is the right to exclude others from making, using, or selling the invention. This necessarily encompasses the right to exclude others from any particular industrial field in which those others might choose to use the invention.[3] This is the right that must be sold to the transferee, and the transfer must cover all practical fields-of-use for the invention.

Realistic use of the approach we have outlined will meet the objectives of the section. For example, a field-of-use restriction in a license may not prevent the transfer from being one of property consisting of all substantial rights to a patent, where the field-of-use to which the licensee is restricted is the only field in which the invention has value. See, e. g., United States v. Carruthers, 219 F.2d 21 (9th Cir.), involving a transfer limited to the tuna industry, but "the patents had no established value for any purpose other than processing tuna fish. * * *" The right to exclude others from making, using or selling the inven-

---

**3.** § 1235 also provides that capital gain treatment is proper where an undivided interest in the property consisting of all substantial rights to a patent is transferred. Where such a transfer is involved, the transferee would not be able literally to exclude "all" others. Nevertheless the parties that own the patent are a single entity having the right to exclude all others.

tion in all practical fields-of-use is a part of the grant which gives existence to and defines the property.

■ While we have discussed the monopoly right of a patent in the technically correct language of the right to exclude[4] we recognize that most patent transfers are written in terms of the right to make, use and sell rather than the right to exclude others from making, using or selling the patented invention. Where such a transfer is involved we hold that in order for the income from the transfer to qualify for § 1235 treatment, the transfer must cover all practical fields-of-use.

Our approach does not affect the right of the holder to retain legal title to the patent or the right to veto sublicenses, since these powers are designed to protect the transferor's interest in the continuance of the purchase payments and do not interfere with the full use by the transferee of the monopoly right in the patent. *See generally,* Deller's Walker on Patents, § 221 (1965).

■ Applying the approach that we outline to the present controversy, we find that the record establishes that the Fawick patents had known value outside the marine service industry at the time of the license, as demonstrated by the licensing arrangement with Fawick Corporation described above. The transaction therefore fails to qualify under § 1235 for capital gain treatment.

In E. I. duPont de Nemours & Co. v. U. S., 432 F.2d 1052 (3rd Cir.), Judge Fullam speaking for the Third Circuit on substantially the same issue as is before this Court said:

> "To determine whether the taxpayer did transfer all of the substantial rights in the patents in question, the key question is whether the transferor retained any rights which, in the aggregate, have substantial value."

The test adopted by the Third Circuit is consistent with our initial inquiry outlined above, although the present case differs in outcome from the *du Pont* case because of the facts to which the test is applied. As was said in *du Pont*:

> "After analyzing each of the [retained] rights individually, and finding it valueless, the District Court concluded that the taxpayer had not retained substantial rights in the patents, and that the transfer qualified for capital gains treatment. Indeed, at the conclusion of this discussion of the various retained rights, Chief Judge Wright expressly stated:
>
> > 'No substantial rights in the eight patents transferred having been retained, the 1954 transactions constituted a sale of those patents, the proceeds of which are entitled to capital gains treatment.' (244a).
>
> Accordingly, the only issue before this Court is whether the District Court findings are clearly erroneous. We have concluded that the record adequately supports the findings of the District Court."

One further point raised by the taxpayer merits discussion. He correctly points to the fact that the statute speaks in terms of transfers of *"property consisting of* all substantial rights to a patent" rather than merely transfers of "all substantial rights to a patent". He then contends that the phrase "all substantial rights to a patent" is a reference to the right to make, use or sell the invention, and that a license to make, use and sell the invention for a given field-of-use is a transfer of property consisting of all those substantial rights.

We reject this argument for two reasons. First, if the section were applicable to all transfers that included the right to make, use and sell the invention, then practically all licensing arrangements would generate capital gain since "property" of that character is transferred even in a non-exclusive license. We do not construe taxpayer's argument to suggest that the section goes that far. Second, in our opinion, Congress used the

---

4. See 35 U.S.C. § 154 (1952).

term "property" in the phrase "property consisting of all substantial rights to a patent" to assure that the section would apply to transfers that take place both before and after the patent is granted, or for that matter, before the patent application is filed. The right to a patent comes into existence at the time the invention is reduced to practice, and when that right is transferred, the "property" consisting of all substantial rights to a patent has been transferred. Section 1235 is applicable even though the patent is not in existence. If the term "property" had been left out of the section, then the section would have applied only to transfers taking place after the patent was issued.

"The section does not apply to a property right in an invention differing from the monopoly rights evidenced by a patent. However, since the inventor possesses an exclusive inchoate right to obtain a patent, he may transfer his interest, whatever it may be, in any subsequently issued patent before its issuance and before as well as after he has made application for such patent." 1954 U.S.Code Cong. & Ad.News p. 5082.

### 4) The Regulations

In 1965 the Commissioner promulgated Treasury Regulation 1.1235–2, as follows:

"Sec. 1.1235–2. *Definition of terms.*

\* \* \* \* \* \*

"(b) *All substantial rights to a patent.* (1) The term 'all substantial rights to a patent' means all rights (whether or not then held by the grantor) which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. The term 'all substantial rights to a patent' does not include a grant of rights to a patent—

\* \* \* \* \* \*

"(iii). Which grants right to the grantee, in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and have value at the time of the grant; or

\* \* \* \* \* \*

"(c) *Undivided interest.* A person owns an 'undivided interest' in all substantial rights to a patent when he owns the same fractional share of each and every substantial right to the patent. It does not include, for example, a right to the income from a patent, or a license limited geographically, or a license which covers some, but not all, of the valuable claims or uses covered by the patent. A transfer limited in duration by the terms of the instrument to a period less than the remaining life of the patent is not a transfer of an undivided interest in all substantial rights to a patent."

The Tax Court held these regulations to be invalid insofar as contrary to its conclusion in the present case, and in William S. Rouverol, 42 T.C. 186, and Vincent B. Rodgers, 51 T.C. 927.

Prior to the promulgation of Regulation 1.1235–2(b) in 1965, a number of courts considered the issue involved in the present case and expressed differing views as to the proper outcome.

In such cases as United States v. Carruthers, 219 F.2d 21 (9th Cir.); First National Bank of Princeton v. United States, 136 F.Supp. 818 (D.N.J.); Milton P. Laurent, 34 T.C. 385; and William S. Rouverol, *supra,* 42 T.C. 186, a grant limited for a given industrial use was held to have qualified as a sale or exchange. On the other hand, in Redler Conveyor Co. v. Commissioner of Internal Revenue, 303 F.2d 567 (1st Cir.), and American Chemical Paint Co. v. Smith, 131 F.Supp. 734 (E.D.Pa.), the courts ruled that a grant of patent rights limited to specific industrial uses was not a grant of the whole patent and that the rights reserved constituted a reservation of substantial portions of the whole right in the patent.

The only other case subsequent to the regulation and considering essentially the same issue is that of Vincent B. Rodgers, 51 T.C. 927, which held that the regulation was invalid.

In our opinion the regulation above quoted embodies the proper interpretation of § 1235. We agree with the reasoning of Redler Conveyor Co. v. Commissioner of Internal Revenue, 303 F.2d 567 (1st Cir.), interpreting § 1235 before promulgation of the regulation.

We find nothing in the opinion in *Rodgers* to convince us that the taxpayer here is entitled to capital gain treatment under § 1235.

### 5) Conclusion

We have considered the opinions in the foregoing cases and feel that the better view supports the position taken by the Commissioner. Moreover, we conclude that Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923, relied upon by several of the courts in analyzing the issue is not authority for determination of the present issue one way or the other. That case was concerned with whether or not a transfer was of a character that would give the transferee the right to sue and did not involve the tax consequences of the transfer. Section 1235 does not speak in terms of assignments or licenses, but rather, it is concerned with the transfer of all substantial rights to a patent, and whether that transfer falls within the *Waterman* definition of an assignment or not is of no consequence to the operation of the statute.

We have considered all other arguments of the taxpayer in support of the decision of the Tax Court and find them to be without merit.

Reversed and remanded to the Tax Court for further proceedings not inconsistent with this opinion.