*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0361p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

VISION INFORMATION SERVICES, L.L.C.,
　　　　　　　　　　　*Petitioner-Appellant,*

　　　*v.*

COMMISSIONER OF INTERNAL REVENUE,
　　　　　　　　　　　*Respondent-Appellee.*

No. 04-2110

On Appeal from the United States Tax Court.
No. 1750-01—David Laro, Tax Court Judge.

Argued: July 26, 2005

Decided and Filed: August 22, 2005

Before: MOORE and COLE, Circuit Judges; WISEMAN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Robert M. Jackson, HONIGAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellant. Steven W. Parks, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert M. Jackson, Roger Cook, James H. Combs, HONIGAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellant. Steven W. Parks, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

_____

　　　KAREN NELSON MOORE, Circuit Judge. This is an appeal from a decision of the United States Tax Court holding that certain sums received by the Petitioner-Appellant, Vision Information Services, L.L.C. ("Vision" or the "taxpayer"), during tax years 1995 and 1996 were license fees and therefore taxable as ordinary income under the Internal Revenue Code. The legal issue presented in this case is whether the agreement between the taxpayer and Twentieth Century Fox Home Entertainment L.L.C. ("FoxVideo") was a sale of intellectual property and thus a capital transaction, or rather a license permitting FoxVideo to use Vision's software solution. Upon review, we conclude that the agreement was an outsourcing arrangement and software license and therefore the Tax Court did not err in finding the payments to Vision were taxable as ordinary income. Accordingly, we **AFFIRM** the Tax Court's judgment.

---

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

## I.  BACKGROUND

Vision Information Services, L.L.C. is a limited liability company headquartered in Royal Oak, Michigan.  For federal tax purposes, Vision is treated as a partnership and its members are treated as partners.  Vision was formed in February 1995 by Correia Vision, L.L.C. and Nordic Group, L.L.C., an affiliate of Nordic Information Systems, Inc. ("Nordic"), to market and provide inventory information management services to manufacturers, distributors, and retailers, allowing them to better manage the flow of product inventory.  Vision provides these services through the use of a software package entitled MVPS/MVPR (the "Nordic Software") developed by Nordic.  The Nordic Software "assists users in tracking the shipment, purchase, retail replenishment, and return of consumer goods between manufacturers and retailers."  Joint Appendix ("J.A.") at 168 (Nordic Software License Agreement at 1).

On the same day that Vision was formed, Nordic and Vision entered into a software license agreement (the "Nordic Software License").  The Nordic Software License states:

> 2.  *LICENSE GRANT AND RESTRICTIONS*.
>
> 2.1  *License*.  Subject to the terms and conditions of this Agreement, Nordic grants to Vision, and Vision accepts, an exclusive perpetual worldwide license to use, copy, modify and enhance the Software, Source Materials and Manuals: (i) to provide Third-Party Service Bureau Services to various third parties . . .; and, (ii) to sub-license the Software to FoxVideo to enable FoxVideo to use the Software to process its own data and the data of its affiliates provided, however, FoxVideo's rights to exercise its rights under such sublicense shall not arise until there is a termination of the service agreement between Vision and FoxVideo for reasons other than a FoxVideo breach or election by FoxVideo to terminate due to a prohibited assignment by Vision. . . .
>
> . . .
> 2.3  *Additional License*.  In addition to the license rights granted in Section 2.1 and in consideration for an eleven (11%) percent payment described more fully below, Nordic hereby automatically grants Vision a more extensive license including, without limitation, a broader grant of exclusivity than stated in Section 2.2. . . .
>
> . . .
> For example, and without limiting the foregoing, if a Manufacturer of cosmetics and Vision agree that for an additional $1 million, such Manufacturer shall have exclusive rights to the Software in its industry, then this license shall be deemed automatically broadened. . . .
>
> . . .
> 4.  *OWNERSHIP, CONFIDENTIALITY AND PROTECTION OF SOFTWARE AND OTHER TRADE SECRETS*.
>
> 4.1  *Nordic Ownership of Software*.  This license is not a sale.  Except as otherwise provided herein, title and all proprietary rights (patents, trade secrets, copyrights and trademarks) to the Software, and any copy made by Vision are held by Nordic.  The Software is copyrighted and is protected by United States and International Copyright Laws.

J.A. at 171, 173-74, 177 (Nordic Software License at 4, 6-7, 10).  Thus, the Nordic Software License authorized Vision to sub-license the Nordic Software to FoxVideo, and also envisioned potential sub-licensing opportunities in other industries as well.

Also on that same day, Vision and FoxVideo entered into a Distribution Information Services Agreement (the "Vision Agreement") which set forth the "preliminary binding agreement" between the two parties. J.A. at 200 (Deal Mem. at 1). The purpose of the agreement was to enable FoxVideo to sell its products directly to retail stores and thereby eliminate the need for a distributor. To accomplish this goal, Vision significantly enhanced the Nordic Software (the enhanced version hereinafter referred to as the "Vision Software") to track the sale of FoxVideo products in retail stores, to determine the necessary product replenishment, and to handle product returns. Rather than simply running the program itself, FoxVideo outsourced the operation to Vision. Bennett Means ("Means"), FoxVideo's vice president for information technology and distribution, testified that "when we had Vision deal directly with our clients, they represented themselves as 20th Century Fox, as agents on our behalf." J.A. at 456 (Trial Tr. at 26). Means explained that "the concept of Vision was to develop a capability without their clients having to invest heavily into technology and processes, and to amortize this capability, perhaps across, in the future, many customers, in many different areas." J.A. at 456 (Trial Tr. at 26).

To effectuate this relationship, FoxVideo and Vision signed the Vision Agreement which states that "Vision shall provide Information Services with respect to the distribution of any product distributed by FoxVideo." J.A. at 211 (Deal Mem. at 7). In exchange for providing these "Information Services," FoxVideo agreed to pay Vision according to a fee schedule attached to the Vision Agreement. The initial term of the Vision Agreement was for five years, but could be extended by FoxVideo for additional five-year terms without additional payment. The Vision Agreement also contains an exclusivity provision which requires that "FoxVideo shall procure Information Services for use in direct-to-store distribution of videocassettes in the United States and Canada exclusively from Vision." J.A. at 212 (Deal Mem. at 8). By contrast, however, the Vision Agreement also states that "Vision shall have the right to provide services, including Information Services, to other entities throughout the Territory" except to Good Times Video and the home video division of any major studio with respect to video products. J.A. at 212 (Deal Mem. at 8).

In addition to the provision of services, the Vision Agreement also contained a conditional license to FoxVideo for the Vision Software. Paragraph seven of the Vision Agreement explains the terms of FoxVideo's conditional license, which is at the heart of this tax case. Paragraph seven of the Vision Agreement states:

7. *VISION SOFTWARE LICENSE/FEE:*

   (a)   *Vision Software License:*

       (i) *Vision's License from Nordic:* The continuing existence and validity of Vision's license of the Nordic Software from Nordic (including all maintenance and related agreements) (collectively, the "Nordic Agreements") shall be of the essence of the Vision Agreement. Maintenance of the exclusivity contemplated hereunder at all times during the Term shall also be of the essence of the Vision Agreement. Any material breach by Nordic of its exclusivity obligations under the Nordic Agreements as contemplated hereunder, or any agreement by Vision to eliminate, modify or otherwise limit Nordic's exclusivity obligations under the Nordic Agreements as contemplated hereunder, shall constitute a default under the Vision Agreement. . . .

       (ii) *Grant of License:* Vision shall grant or cause to be granted to FoxVideo a worldwide, non-exclusive, non-transferable license ("Vision Software License") to use, on its own hardware or otherwise, the Vision Software. The Vision Software License shall have a term coextensive with the Term of the Vision Agreement, including all extensions. . . . In all respects, the

terms granted to FoxVideo under the Vision Software License shall be no less favorable than the terms granted to Vision in the Nordic Agreements. . . . Vision shall retain the right to license (or sub-license) all or any part of Vision Software, subject to restrictions contained herein, in the Vision Agreement and in the Vision Software License. . . .

(iii) *Scope of Use:* FoxVideo shall not have the right to exercise its rights under the Vision Software License (except with respect to interface and other activities contemplated under the Vision Agreement) for so long as the Vision Agreement is in effect (including all extensions). Immediately upon any termination of the Vision Agreement except termination resulting from (A) an uncured breach by FoxVideo, or (B) FoxVideo's election to terminate pursuant to Paragraph 8., FoxVideo shall have the right to fully exercise its rights under the Vision Software License . . . .

(b)   *License Fee:*

(i)   *Payment of Fee:* Except as provided below, FoxVideo shall pay a License Fee to Vision in the aggregate amount of $10 million, payable as follows: (A) $3 million payable on signature of the Vision Agreement; plus (B) $1.75 million payable on each of the first four anniversary dates of the signing of the Vision Agreement. . . .

J.A. at 214-15 (Deal Mem. at 10-11). Thus, paragraph seven indicates that Vision was to provide inventory management services to FoxVideo through the use of the Vision Software, which in turn was built upon the Nordic Software. Vision granted FoxVideo a license to the Vision Software which FoxVideo could only exercise upon termination of the outsourcing agreement between the parties. In exchange for the conditional license, FoxVideo agreed to pay Vision $10 million over five years.

During 1995 and 1996, FoxVideo paid Vision $3 million and $1.75 million pursuant to the terms of the Vision Agreement. On its partnership tax returns for those years, Vision reported the payments as an installment "sale of exclusive rights & know how." J.A. at 110, 125. Vision treated the FoxVideo payments as a long-term capital gain (with the exception of $429,802 of the $1.75 million received in 1996 which was treated as interest from portfolio income). The Commissioner of the Internal Revenue Service (the "Commissioner") determined that the amounts from FoxVideo were "license fee income" and therefore taxable as ordinary income. J.A. at 143 (Notice of Final Partnership Admin. Adjustment 7 (Nov. 20, 2000)). The taxpayer challenged the Commissioner's ruling and filed a petition for readjustment in the United States Tax Court. On March 8, 2004, the Tax Court ruled in favor of the Commissioner, upholding the classification of the FoxVideo payments as license fees and therefore taxable as ordinary income. The court stated that its holding turned on the intent of the parties in signing the Vision Agreement, which it interpreted as a software license. The taxpayer appeals from this ruling.

## II. ANALYSIS

The sole question in this case turns on the proper characterization of the Vision Agreement. The taxpayer argues that despite the fact that the Vision Agreement refers to the payments from FoxVideo as a "license fee," the payments were instead "a sale of exclusive rights & know how" to the direct-to-retail business model and therefore should be treated as a capital gain. We have stated that "[t]he question of whether the language of an agreement is ambiguous is a question of law. Once the language of a contract has been held to be ambiguous, the interpretation of such language is a question of fact that turns on the intent of the parties." *United States v. Donovan*, 348

F.3d 509, 512 (6th Cir. 2003). The Tax Court found the language of the Vision Agreement to be clear. Accordingly, we review the Tax Court's legal findings de novo. *N. Am. Rayon Corp. v. Comm'r*, 12 F.3d 583, 586 (6th Cir. 1993). Applying this standard, we conclude that the Tax Court did not err in concluding that the contract was unambiguous and that FoxVideo's payments were ordinary income.

We begin our analysis by noting that "[t]he cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then, so far as it is possible so to do consistently with legal principles, give effect to that intention." *Pickren v. United States*, 378 F.2d 595, 599 (5th Cir. 1967). We have explained that "[t]he intent of the parties is best determined by the plain language of the contract." *Donovan*, 348 F.3d at 512; *see also* 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 31:4 (4th Ed. 1999) (noting that "primary importance should be placed upon the words of the contract"). "It is clear, therefore, that it is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective, intent that controls." Williston & Lord, *supra* § 31:4. Thus, our first inquiry is whether the language of the Vision Agreement is ambiguous or unclear. We have noted that "[a] court, however, may not use extrinsic evidence to create an ambiguity; the ambiguity must be apparent on the face of the contract." *Donovan*, 348 F.3d at 512 (internal citation omitted).

Applying these principles to this case, we conclude that the unambiguous language of the Vision Agreement reveals the parties' primary intention was both to enter into an outsourcing arrangement and to grant a conditional license of the Vision Software to FoxVideo. First, the Vision Agreement establishes that the taxpayer will provide distribution information services to FoxVideo for a five-year period. In connection with those distribution information services, FoxVideo agreed to pay the taxpayer for the services as outlined in Exhibit A to the Vision Agreement.

In paragraph seven of the Vision Agreement, titled "Vision Software License/Fee," the taxpayer granted a conditional license of the Vision Software to FoxVideo to continue with the direct-to-retail program using the Vision Software in the event that Vision ever terminated the outsourcing agreement. J.A. at 214 (Deal Mem. at 10). Thus, FoxVideo did "not have the right to exercise its rights under the Vision Software License (except with respect to interface and other activities contemplated under the Vision Agreement) for so long as the Vision Agreement is in effect (including all extensions)." J.A. at 215 (Deal Mem. at 11, ¶ 7(a)(iii)). If the outsourcing agreement was ever terminated by Vision, however, FoxVideo could "fully exercise its rights under the Vision Software License, including the right to full access to all material escrowed thereunder." J.A. at 215 (Deal Mem. at 11, ¶ 7(a)(iii)). The clear import of these words establishes that the taxpayer granted a conditional software license to FoxVideo. In exchange for this conditional license, FoxVideo was obligated to "pay a *License Fee* to Vision in the aggregate amount of $10 million," payable as $3 million at signing and $1.75 million each of the next four years. J.A. at 215 (Deal Mem. at 11, ¶ 7(b)(i)) (emphasis added). The unambiguous language of the Vision Agreement confirms the Tax Court's interpretation that the payments by FoxVideo were license fees taxable as ordinary income.

The taxpayer argues that despite the clear language of the Vision Agreement, the transaction was actually a sale of trade secrets and know-how of the direct-to-retail business model to FoxVideo. We find this argument to be wholly without merit. There is simply nothing in the language of the Vision Agreement to support this characterization. The Vision Agreement outlines a service agreement between the parties and grants FoxVideo a conditional license to the Vision Software. There is no mention of a sale of a trade secret or know-how anywhere in the document. To support its argument, the taxpayer relies solely on oral testimony of the parties presented to the Tax Court. Because we find the language of the Vision Agreement to be clear and unambiguous, reliance on extrinsic evidence of the parties' intent is unnecessary. *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir.) (holding that "in this circuit, before a district court can

consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract"), *cert. denied*, 519 U.S. 865 (1996).  In reviewing a similar case, the First Circuit stated:

> The agreements show every evidence of careful and skillful draftsmanship.  And they are licenses in form in that the parties are described as licensor and licensee and the payments to be made under them are called royalties.  Substance controls words to be sure, but when parties obviously skilled in the business at hand use words of art in formal documents carefully drawn we can only assume that the words used were intended to mean what they say.  We can hardly assume that their use was inadvertent or the product of bumbling draftsmanship.

*Redler Conveyor Co. v. Comm'r*, 303 F.2d 567, 569 (1st Cir. 1962); *see also Grace Bros. v. Comm'r*, 173 F.2d 170, 177 (9th Cir. 1949).  We agree with the First Circuit's reasoning in *Redler* and similarly find that the parties' repeated reference to the term "license" throughout paragraph seven of the Vision Agreement as well as use of the term "License Fee" to describe FoxVideo's payments was intentional.  Accordingly, we decline the taxpayer's invitation to rely on oral testimony in the face of clear, contradictory written intent.[1]

Moreover, even were we to accept the taxpayer's invitation to look beyond the plain language of the Vision Agreement, we agree with the Commissioner's contention that FoxVideo's payments to Vision would most likely be considered additional revenue for Vision's outsourcing services, and thus taxable as ordinary income.  The underlying purpose of the Vision Agreement was for the taxpayer to use its know-how and the Vision Software to provide direct-to-retail services on FoxVideo's behalf.  While the Vision Agreement states that the taxpayer is to be compensated for these distribution information services pursuant to the prices set forth in Exhibit A, J.A. at 213 (Deal Mem. at 9, ¶ 6(a)), the schedule in Exhibit A reveals that the vast majority of these services were provided to FoxVideo free of charge.  *See* J.A. at 224 (Exhibit A at 4) (noting that the information management services "are required and are provided without specific charge to the customer").  Exhibit A of the Vision Agreement only provides for additional payment to the taxpayer for its professional services as well as its field merchandising services management.  Forty-eight other services identified in the Vision Agreement are provided by the taxpayer to FoxVideo but not specifically charged.  Thus, were we to construe the payments to the taxpayer without reliance on the licensing language of the Vision Agreement, we would conclude that the evidence demonstrates that the payments were consideration to the taxpayer for the forty-eight other services rendered.  Under the Internal Revenue Code, all payments should be treated as ordinary income unless an exception applies, such as a sale of a capital asset.  In this case, however, there is simply nothing in the record which supports the taxpayer's contention of a sale of a capital asset.  Accordingly, we conclude that, if we were to look beyond the language of the Vision Agreement, the payments by FoxVideo were for services rendered, and therefore, would be treated as ordinary income for tax purposes.

---

[1]In support of its argument, the taxpayer cites several cases from the United States Claims Court which held that "[t]he nomenclature and labels employed by the parties, however, are not decisive; the substance of the transaction governs whether it is a sale or a license." *Liquid Paper Corp. v. United States*, 2 Cl. Ct. 284, 290 (Cl. Ct. 1983); *see also Hooker Chems. & Plastic Corp. v. United States*, 591 F.2d 652, 658 (Ct. Cl. 1979); *Bell Intercont'l Corp. v. United States*, 381 F.2d 1004, 1011 (Ct. Cl. 1967).  The taxpayer's reliance on these cases is misplaced however.

All three of these cases dealt with the issue of "whether the granting clause in the patent agreement is so broad that in legal effect it is an assignment even though the parties call it a license and the payments thereunder royalties." *Redler Conveyor Co. v. Comm'r*, 20 T.C.M. (CCH) 371 (T.C. 1961), *aff'd* 303 F.2d 567 (1st Cir. 1962).  By contrast, the issue in this case is not whether the license to use the Vision Software was so broad as to constitute a sale of the Vision Software, but rather whether the plain language of the Vision Agreement detailing the Vision Software License instead should be read as a sale of the direct-to-retail trade secret.  None of these cases support the taxpayer's argument that language indicating the license of one product actually reveals the sale of another one.

Finally, even assuming *arguendo*, that the Vision Agreement could be read as a sale of a trade secret or know-how, we conclude that FoxVideo's payments would not be considered a sale of a capital asset pursuant to I.R.C. § 1235. Section 1235 states that "[a] transfer . . . of property consisting of all substantial rights to a patent . . . by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year." I.R.C. § 1235. Courts have held that "[s]ecret formulas and trade names are sufficiently akin to patents to warrant the application, by analogy, of the tax law that has been developed relating to the transfer of patent rights, in tax cases involving transfers of secret formulas and trade names." *Pickren*, 378 F.2d at 599. In order to qualify for capital gain treatment for tax purposes under § 1235 however, the sale must be of "all substantial rights" to the trade secret or know-how. The term "all substantial rights" has been defined as all rights "which are of value at the time" of the transfer. 26 C.F.R. § 1.1235-2(b). Thus, where the rights granted are limited in geographic scope or to a specific field of use, the transfer is not a sale of a capital asset under § 1235 absent a showing of no commercial value to the rights in other geographic areas or other fields of use. We have held that the term "all substantial rights" means that "the transfer must cover all practical fields-of-use for the invention." *Fawick v. Comm'r*, 436 F.2d 655, 662 (6th Cir. 1971); *see also Mros v. Comm'r*, 493 F.2d 813, 816 (9th Cir. 1974) (holding that a transfer was not a capital asset sale where the patent had potential value in other fields not subject to the transfer agreement). In *Fawick*, we concluded that because the transfer of rights to a patent was to one specific industry and the patents had known value outside that one industry, the transaction failed to qualify as a sale of a capital asset under § 1235. *Fawick*, 436 F.2d at 663.

Applying these principles to this case, we conclude that the taxpayer would not be entitled to capital gain treatment even assuming the Vision Agreement was a sale of the direct-to-retail trade secret. By the terms of the Vision Agreement, the taxpayer may not provide distribution information services to either Good Times Video or the home video division of any major studio, defined as seven of FoxVideo's competitors. The exclusivity provision specifically covers only the video-products field however. Under the Vision Agreement, the taxpayer could sell its business model to major studios so long as their use of the model is limited to the sale of "CD/ROM's, interactive software, audio products, cartridge-based videogame software or other products that are not Video Products." J.A. at 212 (Deal Mem. at 8, ¶ 5(b)(i)). Moreover, nothing in the Vision Agreement prevents the taxpayer from selling its direct-to-retail model to smaller studios which do not compete with FoxVideo. Likewise, nothing in the Vision Agreement prevents the taxpayer from selling its direct-to-retail model to other industries.

Vision's business model seeks to revolutionize the relationship between the manufacturer and the retailer by eliminating the traditional distributor. The taxpayer has presented no evidence why this solution is only effective with regard to home videos. Indeed, the Nordic Software License specifically envisions the taxpayer utilizing the Nordic Software to implement a direct-to-retail model in other industries, specifically suggesting the cosmetics industry. *See* J.A. at 174 (Nordic Software License at 7). Thus, even assuming that the Vision Agreement could be considered a sale of a trade secret, we conclude that the sale did not cover all practical fields-of-use for the invention and accordingly, was not a sale of all substantial rights under § 1235. Thus, the transaction fails to qualify as a sale of a capital asset and would be treated as ordinary income even under the taxpayer's strained reading of the Vision Agreement.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the Tax Court's judgment holding that the FoxVideo payments were license income and taxable as ordinary income.