HERBERT C. SCHULZE and MARY JEANNE SCHULZE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schulze v. Comm'r
Docket No. 8976-77.
United States Tax Court
T.C. Memo 1980-385; 1980 Tax Ct. Memo LEXIS 195; 40 T.C.M. (CCH) 1234; T.C.M. (RIA) 80385; 210 U.S.P.Q. (BNA) 29; September 16, 1980, Filed *195 1. Petitioner entered into a contractual arrangement with Certain-Teed for development of certain processes patented by petitioner. Held, petitioner failed to prove that the $15,000 he received from Certain-Teed was consideration for transfer of all substantial rights to a patent taxable as capital gain under sec. 1235, I.R.C. 1954. 2. Petitioners' tax return for 1971 was not filed until 1977. Held, petitioners failed to prove that the failure to file the return timely was due to reasonable cause. Addition to tax under sec. 6651(a)(1), I.R.C. 1954, sustained. Herbert C. Schulze, pro se. Jeffrey L. Millward, for the respondent. DRENNEN
*30 MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax in the amount of $5,691.25 and an addition to tax under section 6651(a)(1), I.R.C. 1954 in the amount of $1,422.81 for the taxable year ended December 31, 1971. As a result of concessions, the only issues for decision are: (1) The proper characterization of payments totaling $15,000 received by petitioner Herbert C. Schulze in connection with the implementation of certain of his patented processes; and (2) whether petitioners *196 are liable for the section 6651(a)(1) addition to tax for late filing of their 1971 tax return. FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners Herbert C. Schulze and Mary Jeanne Schulze resided in Incline Village, Nev., when they filed their petition in this case. Petitioners filed a joint Federal income tax return for their taxable year ended December 31, 1971, with an office of the Internal Revenue Service in Phoenix, Ariz., on February 7, 1977. Inasmuch as Mary Jeanne Schulze is a petitioner herein solely by reason of having filed a joint Federal income tax return with petitioner Herbert C. Schulze, the term "petitioner" will hereinafter only refer to Herbert C. Schulze. During the taxable year in issue, petitioner was a practicing attorney who primarily practiced in the areas of patent, trademark and copyright law. In addition to his legal training, petitioner also had experience and education in engineering. The instant case arose as a result of petitioner's activities as an engineer. Over the years prior to 1971, petitioner *197 had been involved in various capacities with the production of pipes and fittings made of asbestos, cement, and other materials. Petitioner experimented with various processes relative to the extrusion of asbestos-cement products and he ultimately obtained three patents relative to specific processes pertaining to forming, extruding, and curing asbestos-cement products. One of these patents, No. 3,356,799, was issued in December 1967. Another, No. 3,549,737, involving the use of carbon dioxide in extruding asbestos-cement products, was issued in December 1970. The third, which involved the use of an inorganic additive in the extrusion of asbestoscement products was issued in April 1975. Certain-Teed Products Corporation (hereinafter Certain-Teed) owned a facility in Buffalo, N.Y., used for manufacturing extruded asbestos-cement products. In 1971 this facility was not operated profitably. In May 1971 a contractual arrangement (it is not clear from the evidence whether it was oral or written) [1] was entered into by Certain-Teed and petitioner whereby during the 3-month period of June-August 1971 an attempt would be made to implement at the Buffalo facility the extrusion processes *198 which petitioner had developed. As part of the arrangement petitioner agreed not only to assist in the implementation of his processes but also to make suggestions concerning general improvement of the operations at the Buffalo facility. Pursuant to the contractual arrangement, petitioner was to receive $5,000 per month during the 3-month period. As part of the same contractual arrangement, petitioner was granted an option to purchase stock in Certaseal, Inc. (hereinafter Certaseal), a subsidiary of Certain-Teed, pursuant to the written agreement set forth in pertinent part below: AGREEMENT
Made this 21st day of May, 1971 between CERTAIN-TEED PRODUCTS CORPORATION ("Certain-teed"), a Maryland corporation, and CERTASEAL, INC. ("Certaseal"), a Delaware corporation, both of Valley Forge, Pennsylvania 19481, and HERBERT C. SCHULZE, ("Schulze"), 999 South Cleveland Street, Oceanside, California 92054. WITNESSETH: *199 WHEREAS, Certain-teed is the owner of a facility in Buffalo, New York used for manufacturing extruded asbestos cement products; and WHEREAS, Schulze is the owner of certain patents relating to the process of extruding asbestos cement products; and *31 WHEREAS, Schulze is desirous of exploiting asbestos cement products made by his process as well as certain processes for extruding asbestos cement products under patents owned by Valley Forge Corporation ("Valley Forge"), a majority owned subsidiary of Certain-teed, and wishes to have an interest in a manufacturing facility for use in such exploitation. NOW THEREFORE, in consideration of the promises contained herein, the parties agree as follows: 1. Certaseal hereby grants to Schulze the option to purchase 40,000 shares of its common stock for a price of $800,000. This option shall continue for a period of one year from the date of this Agreement. The option may not be partially exercised, but must be exercised for the total number of shares. Schulze shall exercise said option by notice in writing received by Certaseal within the option period. A closing ("Closing") shall be held thirty (30) days after receipt of said notice at which *200 time Schulze shall deliver to Certaseal a certified or cashiers check in the amount of $800,000 and Certaseal will deliver a certificate representing 40,000 shares of its common stock. 2. Upon exercise of the above option by Schulze, Certaseal shall at the Closing sell to Schulze 10,000 shares of Certaseal Common Stock. Schulze shall pay for said stock $10,000 by his note for said amount due one year from the date of Closing bearing interest at the rate of six per cent (6%) per annum and Schulze shall also transfer to CertasealUnited States Patents #3,549,737 and #3,356,779 entitled respectively, "Forming Articles of Asbestos-Cement" and "Method of Curing Articles Manufactured From Cement and Asbestos." 3. Upon exercise of the above option by Schulze, Certain-teed shall at the Closing transfer to Certaseal the land, buildings, equipment, inventory, accounts receivable and other miscellaneous assets comprising or used in connection with its Buffalo manufacturing facility (all such property hereinafter called "Buffalo Plant"). The purchase price for the Buffalo Plant shall be not book value on the date of Closing. Certaseal shall pay the purchase price as follows: (a) $500,000 *201 in cash; (b) a term note equal to the remaining net book value payable in ten (10) equal annual installments, the first payment to be due one year from the date of transfer, together with accrued interest at the rate of ten per cent (10%) per annum. The note described above shall be secured by a mortgage on the Buffalo Plant. 4. Upon exercise of the above option by Schulze, Certain-teed shall at the Closing transfer to Certaseal its rights to the nonexclusive right to exploit certain extrusion patents and technology transferred to Valley Forge by an Agreement between Certain-teed and Valley Forge dated May 12, 1970. This transfer shall be subject to and in all respects governed by the term of said May 12, 1970 Agreement. In addition to the right granted under said Agreement, Certain-teed agrees to cause Valley Forge to grant to Certaseal, at the Closing, the right to grant sub-licenses of said patents and technology. Such sub-licenses shall be approved by Valley Forge as to grantee and the terms and conditions thereof. Certaseal shall pay to Valley Forge royalties equal to one-half of all fees and royalties returned to it from sub-licenses. During June-August 1971 petitioner's *202 extrusion processes were tested at the Buffalo facility. Petitioner did receive the $5,000 per month as required in the contractual arrangement. On August 5, 1971, petitioner applied for a patent on the process which involved the introduction of an inorganic additive when extruding asbestos-cement products. A patent was ultimately issued on April 29, 1975. At the end of the 3-month period, the contractual arrangement between Certain-teed and petitioner was terminated, it having not been shown that petitioner's processes could be profitably implemented. The stock option granted petitioner in the agreement set out above was never exercised. On the income tax return for 1971, petitioner reported the $15,000 received from Certain-teed as long-term capital gain under section 1235 as an amount received for the conveyance of patent rights. Petitioner retained a certified public accountant to prepare the 1971 return. A dispute arose between petitioner and the accountant concerning the reporting of a particular transaction not here in issue. Accordingly, petitioner refused to sign the return prepared by the accountant. Subsequently, after retention of a different accountant, a *32 return *203 was filed for 1971 on February 7, 1977. In the staturory notice of deficiency respondent determined that the $15,000 received by petitioner from Certain-teed was for services rendered rather than for a conveyance of patent rights and, therefore, was ordinary income. The section 6651(a)(1) addition to tax was determined upon the absence of a showing that the failure to file a timely return was due to reasonable cause. OPINION The principal issue for decision is the proper characterization of the $15,000 received by petitioner from Certain-teed. Petitioner contends that the contractual arrangement whereby his processes [2] *204 applicable to the extrusion of asbestos-cement products were put into operation at Certain-Teed's Buffalo facility was an exclusive licensing of those processes such that the $15,000 received qualified under section 1235 as long-term capital gain. [3] Respondent argues that the amount is ordinary income. We agree with respondent for a number of reasons. Section 1235 provides, [4] subject to certain conditions, that a transfer of "all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights," will result in longterm capital gain to the transferor since the transfer "shall be considered the sale or exchange of a capital asset." Petitioner has the burden of establishing that he received the $15,000 under circumstances which satisfy the requirements of section 1235. Kueneman v. Commissioner,68 T.C. 609, 619 (1977), affd.     F.2d     (9th Cir. 1980); Rule 142(a), Tax Court Rules of Practice and Procedure. Although transfer of an exclusive license can qualify under section 1235, see sec. 1.1235-2(b)(2), Income Tax Regs., petitioner has failed to establish that his receipt of the $15,000 *205 qualifies under section 1235. In determining whether the contractual arrangement *206 between petitioner and Certain-teed qualifies as a transfer of "all substantial rights" to a patent, it is necessary to make "a detailed factual examination and evaluation of the nature and quantity of the patent rights transferred and retained." Kueneman v. Commissioner,supra at 618 (fn. omitted). See also Fawick v. Commissioner,436 F.2d 655 (6th Cir. 1971), revg. 52 T.C. 104 (1969); Mros v. Commissioner,493 F.2d 813 (9th Cir. 1974), revg. a Memorandum Opinion of this Court. The evidence presented in this case is not sufficient to enable us to make the necessary analysis of the facts. The only evidence concerning the exact nature of the contractual arrangement between petitioner and Certain-teed was petitioner's testimony. Documentary evidence was not introduced, nor did any witness connected with Certain-teed testify. Although we considered petitioner to be a candid witness, his testimony was inexact and did not clearly identify "the nature and quantity of the rights transferred and retained." We have no evidence other than petitioner's bald assertion that the contractual arrangement *33 transferred an exclusive license. This testimony standing alone does not allow for the required *207 detailed factual examination. Moreover, examination of petitioner's testimony and of the stock option agreement leaves the impression that the contractual arrangement was more in the nature of a 3-month trial joint venture, petitioner contributing his patents and knowledge and Certain-teed contributing its Buffalo facility, to explore whether petitioner's processes could be profitably implemented. If the processes could have been profitably implemented, petitioner could have exercised the stock option and, as the agreement notes, have an interest in a facility for use in the exploitation of those processes. When, however, at the end of the 3-month period it had not been shown that the patents could be profitably used, the arrangement was terminated. Even if we were to accept as true petitioner's testimony as to the existence of an exclusive license, we could not hold for petitioner. To qualify under section 1235, a transfer must be of "all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights." At trial petitioner testified that the exclusive license existed for the same length of time as the stock option, 1 year from the date *208 of the agreement. Transfer of an exclusive license for such a duration is not a transfer of "all substantial rights." Sec. 1.1235-2(b)(1)(ii), Income Tax Regs.; see Milberg v. Commissioner,52 T.C. 315 (1969). Apparently recognizing that a transfer of an exclusive license for only a 1-year period would not qualify under section 1235, petitioner on brief states that the transfer was essentially for the life of the patents since the transfer was to Certaseal. Petitioner's testimony solely pertained to a transfer to Certain-teed. While it may have been petitioner's intention, had the implementation of his processes at the Buffalo facility proved successful, that Certaseal would exclusively use the processes, evidence was not introduced to support the statement that a transfer was made to Certaseal. Furthermore petitioner's oral testimony did not specify that the $15,000 was consideration for transfer of the patents or rights to the patents as contemplated by section 1235. See Beausoleil v. Commissioner,66 T.C. 244, 250 (1976). Petitioner's testimony and his 1971 return indicate that the $15,000 was received from Certain-teed while the option agreement states that two of the patents *209 should be transferred by petitioner to Certaseal. Additionally, pursuant to the contractual arrangement, petitioner agreed to assist in the implementation of his processes. Petitioner testified that he did perform services during the 3-month period. Whether payments received by petitioner were for services or for the transfer of patent rights is a factual question which "must be resolved by a careful scrutiny of the record." Beausoleil v. Commissioner,supra at 247. Incidental services performed ancillary to the transfer of patent rights take on the nature of the patent rights as "property" and will not affect the capital nature of the proceeds. PPG Industries, Inc. v. Commissioner,55 T.C. 928, 1015-1016 (1970); United States Mineral Products Co. v. Commissioner,52 T.C. 177, 199 (1969); [5] cf. Glen O'Brien Partition Co. v. Commissioner,70 T.C. 492, 502 (1978). However, from the evidence presented a determination cannot be made whether services performed by petitioner were merely ancillary to the "transfer" of patent rights. Moreover, petitioner also agreed to make suggestions concerning the general operation of the Buffalo facility. Such services would not be incidental to *210 the transfer of patent rights and payment therefor would be ordinary income. In summary, we conclude that petitioner has failed to establish that he received the $15,000 from Certain-Teed solely as consideration for his transfer of "all substantial rights" to his processes. The absence of specific evidence as to whether the payments in issue were for patent rights or services, as to the nature and quality of any rights transferred, and as to the nature of services provided precludes a determination in favor of petitioner. We accordingly sustain respondent's determination that the $15,000 was ordinary income. The final issue for decision is whether petitioner is liable for the section 6651(a)(1) addition to tax determined by respondent. We conclude that he is. Section 6651(a)(1) generally provides that a taxpayer is liable for an addition to tax if he fails to file a return on or before the date it is due, unless such failure is "due to reasonable cause and not due to willful neglect." Treasury Regulations define "reasonable cause" for purposes of section *34 6651(a)(1) as encompassing those circumstances when a taxpayer is unable to file *211 a return when due, notwithstanding the exercise of ordinary business care and prudence. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioner bears the burden of establishing reasonable cause. Bebb v. Commissioner,36 T.C. 170, 173 (1961). There is no evidence that a return for the taxable year in issue was due on other than the normal due date, April 15, 1972. Sec. 6072(a). Petitioner did not file a return until February 7, 1977. At trial petitioner testified that the cause for the untimely filing of the return was a dispute which arose between himself and his accountant concerning the reporting of a particular transaction not here in issue. Accordingly, petitioner refused to sign the return prepared by this accountant since he did not believe it to be correct. This return was apparently not prepared until sometime in 1973. Subsequent thereto petitioner had discussions with Internal Revenue Service personnel concerning his not filing a return. He claims that he attempted to file a return at this time but that such return was not accepted because petitioner made a notation in the margin of the return to the effect that the return was being filed subject to certain qualifications. *212 Finally, after the retention of another accountant, a return was filed. Petitioner is an attorney and there is no evidence that he did not know when the return was due. If a dispute arose between himself and his accountant concerning how a particular transaction should be reported, petitioner should have prepared his own return or sought other professional assistance. We agree with petitioner that a taxpayer should not sign a return which he does not believe is correct. This general principle, however, does not relieve a taxpayer of timely filing a return. Petitioner has not introduced any evidence which even remotely establishes reasonable cause for the nearly 5-year delay in the filing of the return in this case. Accordingly, we sustain the respondent's imposition of the section 6651(a)(1) addition to tax. Because of concessions, Decision will be entered under Rule 155. Footnotes
1. Petitioner testified that he thought the agreement was reduced to writing but he could not produce such a written agreement or copy thereof at the trial. Since petitioner was the only witness at the trial the terms of this arrangement must be deduced solely from petitioners' testimony.↩
2. Neither party suggests that the applicability of sec. 1235 to the amount in issue is in any way limited by the fact that a patent concerning the use of an inorganic additive in the extrusion process was not applied for until Aug. 1971 and was not issued until Apr. 1975. See sec. 1.1235-1(a), Income Tax Regs.; Meiners v. Commissioner,42 T.C. 653, 659 (1964); cf. Glen O'Brien Partition Co. v. Commissioner,70 T.C. 492, 500↩ (1978). We will therefore not consider this point. 3. Petitioner makes no alternative argument that the transaction in issue qualifies for long-term capital gain treatment if sec. 1235↩ does not apply.
4. SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General.--A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are-- (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. (b) "Holder" Defined.--For purposes of this section, the term "holder" means-- (1) any individual whose efforts created such property, or (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither-- (A) the employer of such creator, not (B) related to such creator (within the meaning of subsection (d)).↩
5. Gable v. Commissioner,T.C.Memo. 1974-312↩.