This Opinion Is a
Precedent of the TTAB

Mailed: July 30, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Guaranteed Rate, Inc.*

_____

Application Serial No. 87054820
Application Serial No. 87054849

_____

Rebecca Liebowitz of Venable LLP, for Guaranteed Rate, Inc.

Andrea P. Butler, Trademark Examining Attorney, Law Office 124,
    Lydia Belzer, Managing Attorney.

_____

Before Bergsman, Lynch and Larkin, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

The issue addressed by this decision is whether Applicant has proven that the words "GUARANTEED RATE" have acquired distinctiveness.

Guaranteed Rate, Inc. (Applicant) seeks registration on the Principal Register of the marks listed below both for "financial services, namely, mortgage refinancing; mortgage banking; mortgage banking services, namely, origination, acquisition, servicing, securitization and brokerage of mortgage loans; mortgage brokerage; mortgage lending; mortgage refinancing," in Class 36 (hereafter collectively "mortgage lending services"):

Serial No. 87054820
Serial No. 87054849

1. GUARANTEED RATE (in standard characters) under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f);[1] and

2. GUARANTEED RATE and design shown below:[2]



The second application includes the following description of the mark:

> The mark consists of the word "GUARANTEED" in grey and "RATE" in white, where the word "RATE" appears on a red arrow pointing down.
>
> The color(s) grey, red and white is/are claimed as a feature of the mark.

Applicant claims that the term "Guaranteed Rate" in the second application has become distinctive of its described services pursuant to Section 2(f) of the Trademark Act.

Applicant claims ownership of the registered marks listed below:

1. Registration No. 3144843 for the mark GUARANTEED RATE and design, reproduced below, for "mortgage banking and mortgage brokerage services," in Class 36:[3]

---

[1] Application Serial No. 87054820 filed May 31, 2016, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming first use anywhere and first use in commerce as of March 2000.

[2] Application Serial No. 87054849 filed May 31, 2016, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming first use anywhere and first use in commerce as of March 2000.

[3] Registered September 19, 2006; renewed.



The description of the mark reads as follows:

> Color is not claimed as a feature of the mark. The mark consists of the words "guaranteed rate" together with a fanciful downward arrow design.

Applicant disclaimed the exclusive right to use "Guaranteed Rate."

2. Reg. No. 5470704 for the mark GUARANTEED RATE AFFINITY (in standard character form) for "financial services, namely, mortgage refinancing; mortgage banking; mortgage banking services, namely, origination, acquisition, servicing, securitization and brokerage of mortgage loans; mortgage brokerage; mortgage lending; mortgage refinancing," in Class 36.[4]

Applicant claimed that "Guaranteed Rate" has acquired distinctiveness under Section 2(f) of the Trademark Act; and

3. Registration No. 5470770 for the mark GUARANTEED RATE AFFINITY and design, reproduced below, for "financial services, namely, mortgage refinancing; mortgage banking; mortgage banking services, namely, origination, acquisition, servicing, securitization and brokerage of mortgage

---

[4] Registered May 15, 2018.

loans; mortgage brokerage; mortgage lending; mortgage refinancing," in Class 36.[5]



The description of the mark reads as follows:

> The color(s) black, white and red is/are claimed as a feature of the mark. The mark consists of the word "GUARANTEED" in black and "RATE" in white, where the word "RATE" appears on a red arrow pointing down, and the word "AFFINITY" appears in white and black below "GUARANTEED" and the A in "AFFINITY" appears in a red rectangle.

Applicant claimed that "Guaranteed Rate" has acquired distinctiveness under Section 2(f) of the Trademark Act.

The Examining Attorney refused registration of the marks in the involved applications under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that the term GUARANTEED RATE is merely descriptive and must be disclaimed in the composite mark, and Applicant's claim of acquired distinctiveness is insufficient to support registration as to either mark. In addition, the Examining Attorney refused to register Applicant's marks on the ground that the term GUARANTEED RATE in the applied-for marks fails to function as a mark because it is merely informational. Sections 1, 2, 3, and 45 of the Trademark Act, 15 U.S.C. §§ 1051-1053, 1127.

---

[5] Registered May 15, 2018.

We consolidate the appeals in these applications because they share common issues of fact and law. *See In re S. Malhotra & Co. AG*, 128 USPQ2d 1100, 1102 (TTAB 2018); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1214 (2020). Citations to the record are to the file history of Application Serial No. 87054820 unless otherwise indicated.[6]

In these appeals, Applicant has conceded that GUARANTEED RATE is descriptive by claiming that it has acquired distinctiveness as its service mark. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) ("Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the *statute* accepts a lack of inherent distinctiveness as an established fact."). Applicant bears the burden to establish acquired distinctiveness, *id.* at 1006, and the Examining Attorney contends that the Section 2(f) showing is insufficient.

To establish that a term has acquired distinctiveness, "an applicant must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *See In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015) (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d

---

[6] References to the briefs, motions and orders on appeal are to the Board's TTABVUE docket system. Citations to the examination record refer to the Trademark Office's online Trademark Status & Document Retrieval system (TSDR), by page number. All citations to the documents contained in the TSDR database are to the downloadable .pdf version of the documents.

1713, 1729 (Fed. Cir. 2012)). To meet this burden, an applicant may offer three basic types of evidence:

1. A claim of ownership of one or more active prior registrations on the Principal Register of the same mark for goods or services that are sufficiently similar to those identified in the pending application. Trademark Rule 2.41(a)(1), 37 C.F.R. § 2.41(a)(1).

2. A verified statement that the mark has become distinctive of the applicant's goods or services by reason of the applicant's substantially exclusive and continuous use of the mark in commerce for five years before the date on which the claim of distinctiveness is made. Trademark Rule 2.41(a)(2), 37 C.F.R. § 2.41(a)(2).

3. Other appropriate evidence of acquired distinctiveness. Trademark Rule 2.41(a)(3), 27 C.F.R. § 2.41(a)(3).

The applicant may submit one or any combination of these types of evidence. Depending on the nature of the mark and the facts in the record, the examining attorney may determine that a claim of ownership of a prior registration(s) or a claim of five years' substantially exclusive and continuous use in commerce is insufficient to establish a prima facie case of acquired distinctiveness.[7] In which case, the applicant may then submit additional other evidence of acquired distinctiveness.

---

[7] Under the statute, the Director is not required to accept these claims and has discretion to require the applicant to submit other evidence to show an applicant's mark has become distinctive. *See* Section 2(f) (stating that "[t]he Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness

Our ultimate Section 2(f) analysis of acquired distinctiveness and determination in this case is based on all of the evidence considered as a whole.

> [T]he considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the [mark] with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark.

*In re Snowizard, Inc.*, 129 USPQ2d 1001, 1005 (TTAB 2018) (quoting *Converse, Inc. v. Int'l Trade Comm'n*, 907 F.3d 1361, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018)). "All six factors are to be weighed together in determining the existence of secondary meaning." *Converse*, 128 USPQ2d at 1546.

To assess Applicant's burden in showing acquired distinctiveness, we must determine the degree of descriptiveness of GUARANTEED RATE. *In re Virtual Indep. Paralegals, LLC*, 2019 USPQ2d 111512, *10 (TTAB 2019) (citing *Royal Crown Cola Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1048 (Fed. Cir. 2018)). We find that the term "GUARANTEED RATE" is highly descriptive when used in connection with mortgage lending services because it immediately conveys a feature of the services (i.e., a mortgage rate that will not change). In fact, in our view, the term "guaranteed rate" rises to the level of being a key aspect of the services. *Cf.*

---

is made") (emphasis added); *see also La. Fish Fry*, 116 USPQ2d at 1265 ("Although Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), provides that the PTO may accept five years of 'substantially exclusive and continuous' use as prima facie evidence of acquired distinctiveness, the statute does not require the PTO to do so.").

*Royal Crown Cola v. Coca-Cola,* 127 USPQ2d at 1047 ("The Board therefore must consider whether ZERO is generic because it refers to a key aspect of at least a sub-group or type of the claimed beverage goods.").[8]

The Examining Attorney introduced evidence to prove that GUARANTEED RATE is merely descriptive and has not acquired distinctiveness in the form of dictionary definitions of the component words,[9] and third-party uses of "guaranteed rate," and similar terms such as "guaranteed mortgage rate,"[10] and "guaranteed interest rate."[11]

---

[8] Words that identify a key aspect of a service may indicate that a term is generic. *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.,* 906 F.3d 965, 128 USPQ2d 1370, 1379 (Fed. Cir. 2018) ("[A] term can be generic for a genus of goods or services if the relevant public understands the term to refer to a *key aspect* of that genus.'), *quoting Royal Crown,* 127 USPQ2d at 1046 (ellipsis, internal quotation marks, and citation omitted); *In re Cordua Rests., Inc.,* 823 F.3d 594, 118 USPQ2d 1632, 1637 (Fed. Cir. 2016) (same). But the Examining Attorney here did not make a genericness refusal. Nevertheless, we consider the fact that there is potential evidence of genericness to support our finding that the term is highly descriptive.

[9] October 23, 2017 Office Action (TSDR 8-29).

[10] As examples: the Bankrate.com webpage attached to the October 23, 2017 Office Action (TSDR 32) on "Abbreviations used in mortgage tables" defines "Lock" as "the practice of guaranteeing an interest rate on a mortgage for a specific number of days… locking in a guaranteed mortgage rate"); the Century 21 website, attached to the October 23, 2017 Office Action (TSDR 103) page on Mortgage Definitions, defines "lock-in" as "A specific, guaranteed interest rate if the loan is closed within a specific time"; State Bank of Chilton website attached to the October 23, 2017 Office Action (TSDR 34) reverts to a "60 day rate lock" and "[y]our guaranteed mortgage rate"; The My Mortgage Insider website attached to the October 23, 2017 Office Action (TSDR 43) promotes that "[a]nother advantage to opting for an ARM is that you have a guaranteed mortgage rate for a short amount of time."

[11] As examples: The Truth About Mortgage website attached to the October 23, 2017 Office Action (TSDR 46) features an article titled "Do Mortgage Rates Change Daily?" stating "if you want a guaranteed interest rate on your mortgage, you need to lock it in." The Merrimack Valley Credit Union website attached to the October 23, 2017 Office Action (TSDR 49) offers to "lock in a guaranteed interest rate up to 60 days before closing." The Strive Lending website attached to the October 23, 2017 Office Action (TSDR 51) discusses VA mortgages, describing one as having "a guaranteed interest rate for the first five years." The SECU Mortgage Glossary attached to the October 23, 2017 Office Action (TSDR 54) entry for "Lock Period" states that "[i]n order to hold the guaranteed interest rate for a loan, the loan closing must occur during the lock period."

The examples of the use of "guaranteed rate" listed below are representative of the third-party evidence the Examining Attorney submitted:[12]

> The Mortgage Professor website's Tutorial on Annual Percentage Rate, 5 TTABVUE 13, explains that "[a] HELOC is line of credit… If the HELOC has an introductory **guaranteed rate**, any rate adjustments are deferred, but typically guaranteed rates hold for only a few months."

> The State Bank Delano Mortgage website attached to the October 23, 2017 Office Action (TSDR 30) states, "In order to receive a **guaranteed rate**, you must have applied for an application through State Bank of Delano and received a verbal confirmation from a loan officer that your desired rate is locked. Your **guaranteed mortgage rate** will depend on factors …."

> The Mortgages Unlimited website attached to the October 23, 2017 Office Action (TSDR 38) states, "RATE GUARANTEE: In order to receive a guaranteed rate, you must have applied for an application through the Metzler Team at Mortgages Unlimited and received a WRITTEN confirmation from a loan officer that your desired rate is locked. Your **guaranteed mortgage rate** will depend…."

Generally, the evidence conveys that "locking in" a mortgage rate is referred to and explained as obtaining a "guaranteed rate" (often used interchangeably with "guaranteed mortgage rate" and "guaranteed interest rate") for a particular period. These uses collectively show that GUARANTEED RATE is highly descriptive of mortgage lending services. *Apollo Med. Extrusion Techs., Inc. v. Med. Extrusion Techs., Inc.*, 123 USPQ2d 1844, 1849-51 (TTAB 2017) (third-party uses of elements

---

[12] *See also* the third-party uses of "Guaranteed Rate(s)" to advertise mortgage lending services the Examining Attorney submitted to show that Applicant's use evidence of acquired distinctiveness is not substantially exclusive, which we discuss *infra*.

of applicant's claimed mark MEDICAL EXTRUSION TECHNOLOGIES established that the claimed mark was highly descriptive). Because of the highly descriptive nature of the proposed mark, Applicant faces a proportionately higher burden to establish acquired distinctiveness. *Royal Crown Cola v. Coca-Cola*, 127 USPQ2d at 1047 ("'the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning.'") (quoting *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005)).

Applicant did not submit any consumer survey or other direct evidence of the association of GUARANTEED RATE with Applicant,[13] nor any evidence of intentional copying. It relies instead on evidence under the second, third, fourth and sixth considerations for a Section 2(f) claim set out above, as well as the declaration of an officer of Applicant recounted below, to prove that "GUARANTEED RATE" has acquired distinctiveness:

---

[13] "Consumer surveys can, when conducted properly, be a form of direct evidence of acquired distinctiveness," *In re Hikari Sales USA, Inc.*, 2019 USPQ2d 111514, *14-15 (TTAB 2019), and may be helpful in proving it, but they are not required. *See Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 128 USPQ2d 1739, 1743 & n.2 (Fed. Cir. 2018) (citing *Yamaha Int'l Corp.,* 6 USPQ2d at 1010). *See also* Trademark Rule 2.41(a)(3); 37 C.F.R. § 2.41(a)(3) (to prove acquired distinctiveness, an applicant may submit "verified statements, depositions, or other appropriate evidence showing duration, extent, and nature of the authorized users' use in commerce and advertising expenditures in connection therewith (identifying types of media and attaching typical advertisements), and verified statements, letters or statements from the trade or public, or both, or other appropriate evidence of distinctiveness.").

1. Applicant has been using GUARANTEED RATE in connection with mortgage lending services since 2000.[14]

2. As discussed above, Applicant is the owner of Reg. No. 5470704 for the mark GUARANTEED RATE AFFINITY (in standard character form) and Registration No. 5470770 for the mark GUARANTEED RATE AFFINITY and design, for the same mortgage lending services identified in the applications at issue. These marks registered with a claim of acquired distinctiveness for the term "GUARANTEED RATE." There is no evidence that these registrations are subject to any petitions for cancellation.[15]

3. "Since 2007, Applicant has spent more than $140,972,095 in advertising and promotional activities for its mortgage lending services under the GUARANTEED RATE mark."[16] In fiscal year 2017 alone, Applicant spent $33,930,234 advertising and promoting its mortgage lending services under GUARANTEED RATE.[17]

---

[14] Blabolil Decl. ¶3 attached to the September 14, 2017 Response to Office Action (TSDR 11). Rebecca Blabolil is Applicant's Chief Compliance Officer. *Id* at ¶1 (TSDR 11).

[15] Applicant's Brief, p. 19 (12 TTABVUE 22) (referring to the prior registrations as evidence of acquired distinctiveness). The Examining Attorney argues that Applicant's registrations are not relevant because each application must be considered on its own record. Examining Attorney's Brief (14 TTABVUE 17). However, the two registrations are evidence of record that we may consider in analyzing whether GUARANTEED RATE has acquired distinctiveness.

[16] Blabolil Decl. ¶7 attached to the April 19, 2018 Request for Reconsideration (4 TTABVUE 91).

[17] *Id.* at ¶8 (4 TTABVUE 91).

4.  Representative samples of Applicant's advertising are reproduced below. We note that, with some exceptions, they mostly show Applicant's proposed  mark that includes stylization and a design element:

a.  June 2017 Milwaukee Brewers baseball games[18]

b.  Postcard mailer[19]



---

[18] Blabolil Decl. attached to the September 14, 2017 Response to Office Action (TSDR 16).

[19] *Id.* at TSDR 26-27.

Serial No. 87054820
Serial No. 87054849



c. General Advertisement[20]



---

[20] *Id.* at TSDR 29.

5. "Applicant estimates that it has earned more than $3,581,871,186 in sales for Applicant's services under the GUARANTEED RATE mark in the past 11 fiscal years."[21] In fiscal year 2017 alone, Applicant earned $569,470,597 in sales for its services.[22]

6. In 2016, Scotsman Guide, a mortgage industry publication, ranked Applicant's GUARANTEED RATE mortgage lending services as the fifth largest mortgage lender in overall volume.[23]

7. "The services under the GUARANTEED RATE mark are sold to over 500,000 customers throughout the country."[24]

8. The Zillow website (Zillow.com) profiles GUARANTEED RATE as a mortgage lender:



> Guaranteed Rate is the eighth large retail mortgage lender in the U.S. … Guaranteed Rate has helped hundreds of thousands of homeowners with approximately $100 billion in home purchase loans and refinance since 2000 and $18 billion in 2015 alone. Guaranteed Rate was ranked No. 1 in Scotsman Guide's Top Mortgage Lenders 2015 honors and was named one of Chicago's Top Workplaces by the

---

[21] *Id.* at ¶4 (4 TTABVUE 90). It is not clear what Applicant means by "earned more than … in sales."

[22] *Id.* at ¶5 (4 TTABVUE 90).

[23] *Id.* at ¶13 (4 TTABVUE 91); *see also* Top Overall Volume: Scotsman's Guide's Top Mortgage Lenders 2016 reporting over 73,000 closed loans amounting to $23 billion dollars in volume in 2016 (4 TTABVUE 57).

[24] Blabolil Decl. ¶32 attached to the September 14, 2017 Response to Office Action (TSDR 13). We interpret this to mean that Applicant has underwritten over 500,000 mortgages.

Chicago Tribune in four of the past five years. In 2015, Guaranteed Rate was recognized as one of Inc. 5000's Fastest Growing Companies in America.

Zillow posts 5577 reviews of Guaranteed Rate.[25]

9. The Lending Tree website (lendingtree.com) posts 935 reviews of GUARANTEED RATE.[26]

10. The Bankrate website (bankrate.com) posts 255 reviews of GUARANTEED RATE.[27]

11. The Nerdwallet website (nerdwallet.com) reviewed Applicant as follows:[28]

Guaranteed Rate

Mortgage Review

Deborah Kearns (January 11, 2018)

Headquartered in Chicago, Guaranteed Rate has closed more than $100 billion in mortgage loans since its inception in 2000. The company has weathered housing booms, busts and everything in between with a single goal: to transform the mortgage industry by offering customers transparency and efficiency.

\* \* \*

Online, you'll find that Guaranteed Rate enjoys high marks and hundreds of positive reviews on sites like Better Business Bureau, Yelp and LendingTree.com.

---

[25] Blabolil Decl. attached to the April 19, 2018 Request for Reconsideration (4 TTABVUE 20).

[26] *Id*. at 4 TTABVUE 22.

[27] *Id*. at 4 TTABVUE 28.

[28] *Id*. at 4 TTABVUE 33-40; Blabolil Decl. attached to the September 14, 2017 Response to Office Action (TSDR 41 and 52). *See also* ConsumerAdvocate.org at 4 TTABVUE 42, and ValuePenguin.com at 4 TTABVUE 47.



12. Applicant ran an advertisement for its GUARANTEED RATE mortgage lending services during the 2016 Super Bowl.[29]

13. The Chicago Tribune has recognized Applicant as a top workplace in 2010 and 2012-2017.[30]

14. Chicago Agent Magazine named Applicant as the top lender of the year in 2010 and 2016.[31]

15. Effective November 1, 2016, the Chicago White Sox baseball team changed the name of its stadium to GUARANTEED RATE Field.[32] An article posted on the Chicago Tribune website (chicagotribune.com) reported that "[i]n a marriage between the White Sox and one of the largest home lenders in the United

---

[29] *Id.* at 4 TTABVUE 58. The news article regarding Applicant's advertisement reported that Applicant's advertisement ran in the Chicago, Boston, Tampa, and Salt Lake City markets.

[30] *Id.* at ¶19 (4 TTABVUE 59, 61, and 92).

[31] *Id.* at ¶15 (4 TTABVUE 59 and 91).

[32] *Id.* at ¶20 (4 TTABVUE 77-81 and 92).

States, the ballpark located at 35th and Shields will undergo a name change Nov. 1 from U.S. Cellular Field to Guaranteed Rate Field."[33]

In part to counter the claim of acquired distinctiveness, the Examining Attorney submitted examples of third parties using "Guaranteed Rate(s)" to advertise their mortgage lending services. *See, e.g.*, *In re Boston Beer Co.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) ("The examples of use of the phrase by others in its descriptive form support the board's conclusion that the mark had not acquired distinctiveness."). The third party users, some of which we referred to above, are listed below:

1. BRealEstate.net advertising "guaranteed rates" reproduced below:[34]



2. Refinancenjz.com advertising its "loan rates online" including "Guaranteed Rate Mortgage Payment."[35]

---

[33] 4 TTABVUE 78. The article also quoted Marc Ganis, a Chicago-based sports business consultant, who said "You're in one of the great corporate environments in the world, in the third-largest market in the United States, with a sport that plays 81 home games, with a stadium that is on one of the most traveled highways in the country." (4 TTABVUE 80).

[34] May 18, 2018 Denial of Request for Reconsideration (6 TTABVUE 6).

[35] *Id.* at 6 TTABVUE 9.

3. US Bank website (usbank.com) advertising its rates on VA loans and explaining that "Your guaranteed rate will depend on various factors including loan product, loan size, credit profile, property value, geographic location, occupancy and other factors."[36]

4. Woodlands National Bank (woodlandsnationalbank.com) advertising its mortgage rates and explaining that "Your guaranteed rate will depend on various factors including loan product, loan size, credit profile, property value, geographic location, occupancy and other factors."[37]

5. Adirondack Trust Company (adirondacktrust.com) advertising its fixed-rate mortgages that include a "Guaranteed rate for the term of your loan."[38]

6. Webster Bank (websteronline.com) advertising adjustable rate mortgages. In its disclaimer statement, the bank warns that the figures used in its website are exemplary and do not "represent a guaranteed rate."[39]

7. Farmington Bank (farmingtonbank.com) advertising adjustable rate mortgages. In its disclaimer statement, the bank warns, "This APR listed as an example only and does not represent a guaranteed rate."[40]

8. State Bank Delano Mortgage (statebankofdelano.com) presenting its "Daily Interest Rates Table." The bank advises "In order to receive a guaranteed rate,

---

[36] *Id.* at 6 TTABVUE 10.

[37] *Id.* at 7 TTABVUE 2.

[38] *Id.* at 7 TTABVUE 5.

[39] *Id.* at 8 TTABVUE 5.

[40] *Id.* at 8 TTABVUE 9.

you must have applied for an application through State Bank of Delano and received a verbal confirmation from a loan officer that your desired rate is locked."[41]

9. Mortgages Unlimited (joemetzler.com) explains:

> RATE GUARANTEE: In order to receive a guaranteed rate, you must have applied for an application through the Metzler Team at Mortgages Unlimited and received WRITTEN confirmation from a loan officer that your desired rate is locked."[42]

Also, as we previously noted, the record includes third-party uses of similar terms such as "guaranteed mortgage rate,"[43] "guaranteed interest rate,"[44] and "rate guarantee"[45] in connection with mortgage lending services.

Under the third and fourth considerations of *Converse*, Applicant's advertising and sales figures are impressive. There also is some evidence under the sixth consideration that Applicant has received unsolicited media coverage of its business generally, which the sales numbers suggest is a successful business. However, we are not convinced that this evidence demonstrates consumer recognition of this highly descriptive wording as indicating a single source especially because of the extensive evidence of third-party use. *See Boston Beer,* 53 USPQ2d at 1058-59 (claim based on annual sales under the mark of approximately eighty-five million dollars, and annual

---

[41] October 23, 2017 Office Action (TSDR 31).

[42] *Id.* at TSDR 39.

[43] October 23, 2017 Office Action (TSDR 35).

[44] October 23, 2017 Office Action (TSDR 50, 66, 73, 102, 105, and 109).

[45] March 14, 2017 Office Action (TSDR 15, 16, 18, 19, 21, 23, and 25); August 31, 2016 Office Action (TSDR 34, 37, 39, and 42).

advertising expenditures in excess of ten million dollars, not sufficient to establish acquired distinctiveness in view of highly descriptive nature of the mark, which was in part supported by "use of the phrase by others in its descriptive form"); *In re Melville Corp.*, 228 USPQ 970, 972 (TTAB 1986) (affirming the rejection of Section 2(f) evidence as insufficient, regardless of $70 million in advertising and $3.7 billion in revenue, given "the absence of any direct evidence that the purchasing public has come to recognize applicant's slogan [BRAND NAMES FOR LESS] as a term identifying applicant's services").

We first find that standing alone, Applicant's use since 2000 is not dispositive, even if we would consider Applicant's use to be substantially exclusive. "Although Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), provides that the PTO may accept five years of 'substantially exclusive and continuous' use as prima facie evidence of acquired distinctiveness, the statute does not require the PTO to do so." *La. Fish Fry*, 116 USPQ2d at 1265. The USPTO and the Board have discretion to find such a use claim insufficient, especially where, as here, the mark at issue is highly descriptive and third parties use it in connection with the same kinds of services covered by Applicant's application. *Id. See also In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) (affirming USPTO's decision to require more than an affidavit of eight years of continuous and substantially exclusive use); *In re Kalmbach Publ'g Co.*, 14 USPQP2d 1490, 1492 (TTAB 1989) (deeming a Section 2(f) claim of more than 10 years of use insufficient for a highly descriptive mark "without specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers'

perception of the asserted mark"); *In re Synergistics Research Corp.*, 218 USPQ 165, 167 (TTAB 1983) ("we have consistently held that a declaration or affidavit of continuous and exclusive use as a mark for an extended period of years is insufficient in and of itself to support registrability under Section 2(f) of the Trademark Act where the term sought to be registered is highly descriptive in character").

Although the scope of Applicant's use is extensive, the record is unclear to what extent Applicant uses the wording GUARANTEED RATE standing alone, rather than as part of its mark with stylization and a design that includes color.[46] This is significant because the greater the extent of the use of the word mark together with these other elements, the more difficult it is for Applicant to show "that consumers perceive the wording alone as an indication of source of the [services], rather than as a highly descriptive designation." *Apollo Med. Extrusion Techs.*, 123 USPQ2d at 1855.

The nature and number of third-party descriptive uses in the record undermines Applicant's attempt to obtain trademark rights in a designation that is not inherently distinctive, because it interferes with the relevant public's perception of the designation as an indicator of a single source. *See, e.g.*, *Boston Beer*, 53 USPQ2d at 1058; *see also Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1730 (Fed. Cir. 2012) ("We conclude that the Board's failure to

---

[46] For example, in application Serial No. 87054820 for GUARANTEED RATE in standard character form, the specimen of use displayed the stylized mark with the design. Even the advertisements evidencing the use of the standard character GUARANTEED RATE mark also displayed the mark in stylized form. *See* September 14, 2017 Office Action (TSDR 29-30). Applicant's Twitter, Facebook, Instagram, and YouTube accounts feature GUARANTEED RATE alongside Applicant's red arrow design mark. April 19, 2018 Request for Reconsideration (4 TTABVUE 68-71).

consider all pre-decision third-party use of the term 'coach' for educational materials undermines its secondary meaning analysis and requires remand so that the Board can assess the extent to which those titles might cut against a claim of 'substantially exclusive use.'"); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances."); *House of Worsted-Tex, Inc. v. Superba Cravats, Inc.*, 284 F.2d 528, 128 USPQ 119, 121 (CCPA 1960) ("At the very least, the record shows that 'Ivy League' has a primary meaning according to which it indicates a group of eastern colleges and universities and, by extension, things and matters pertaining thereto.  In the clothing field 'Ivy League' clothing would indicate to persons familiar with the 'Ivy League' educational institutions—and their number is legion—styles somehow associated therewith.  It would require much to develop a secondary meaning whereby the public would come to associate 'Ivy League' with a single manufacturer or vendor"); *DeWalt, Inc. v. Magna Power Tool Corp.*, 289 F.2d 656, 129 USPQ 275, 279 (CCPA 1961) ("Power Shop" for woodworking saws is not substantially exclusive "in view of [Opposer's] millions of competitive and continuing uses of 'power shop.'").[47]

---

[47] *See also In re Gen. Mills IP Holdings II, LLC*, 124 USPQ2d 1016, 1024 (TTAB 2017) (finding that "the presence in the market of yellow-packaged cereals from various sources . . . would tend to detract from any public perception of the predominantly yellow background as a source-indicator pointing solely to Applicant."); *Apollo Med. Extrusion Techs.*, 123 USPQ2d at 1853 (finding that "the nature and number of third-party descriptive uses in the record indicate that use by applicant [of MEDICAL EXTRUSION TECHNOLOGIES] has not been

The copious evidence of third-party use of "guaranteed rate," "guaranteed mortgage rate," and "guaranteed interest rate" in connection with mortgage lending services weighs heavily against Applicant's claim of acquired distinctiveness. That other entities have repeatedly used this wording in connection with mortgage lending services is inconsistent with the requirement for acquired distinctiveness that the mark sought to be registered indicate a single source. Given the number of third-party uses in the same field in which Applicant uses it, consumers are likely to perceive the term "Guaranteed Rate" when used in connection with mortgage lending services not as a trademark for one company, but rather as a term commonly used by many entities in the industry, and in common speech, to describe a feature of mortgage services. *See Apollo Med. Extrusion Techs.,* 123 USPQ2d at 1854 (citing *Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 172 USPQ 361, 363 (CCPA 1972) ("evidence of a significant and continuous concurrent use of the term by appellee rebuts appellant's contention that it has exclusively and continuously used the mark with the result that it has become distinctive of its goods.")). As the Board stated in a similar case:

> [T]he average cigarette consumer would be likely to equate
> "ENRICHED FLAVOR" with other similar designations
> [*e.g.*, "Full Rich Tobacco Flavor," "Full Flavor," and "Rich
> Tobacco Flavor"] that he or she has been exposed to over
> the years and attribute it to the same descriptive
> significance intended by the other phrases, namely, a

---

'substantially exclusive as is required for a showing of acquired distinctiveness under Section 2(f)"); *Sheetz of Del., Inc. v. Doctor's Assoc. Inc.*, 108 USPQ2d 1341, 1370 (TTAB 2013) (extensive third-party use weighs against finding applicant's use of FOOTLONG for sandwiches substantially exclusive).

> message to the effect that applicant's "MERIT" cigarettes
> have an enriched flavor or, if you will, a rich full flavor.

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 210 USPQ 34, 42 (TTAB 1981). Likewise, consumers would equate the term "Guaranteed Rate" with "guaranteed mortgage rate" and "guaranteed interest rate," and attribute to "Guaranteed Rate" the same highly descriptive significance.

We note again that Applicant did not offer a survey showing that the words GUARANTEED RATE alone (apart from Applicant's stylized form and color-bearing design) serves as a designator of a unique source of mortgage lending services. While we of course do not imply that a survey is legally necessary,[48] we find that, on the record here, the evidence is insufficient to convince us that "in the minds of the public, the primary significance of [the] term is to identify the source of the [service] rather than the [service] itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11, 214 USPQ 1, 4 n.11 (1982). *See also Roselux Chem. Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 132 USPQ 627, 633 (CCPA 1962) ("Distinctiveness means that the primary meaning of the word, in this limited field, is as a designation of source rather than of a characteristic of the product."). Rather, the evidence of record, on balance, indicates to us that "the primary function, in this limited field, of the word[s] for which registration is sought is in describing a characteristic of the [service]". *In re Preformed Line Prods. Co.*, 323 F.2d 1007, 139 USPQ 271, 272 (CCPA 1963).

---

[48] Nor do we imply that a survey favorable to Applicant would change our decision.

Finally, we turn to Applicant's arguments that we consider that GUARANTEED RATE has acquired distinctiveness because Applicant was able previously to obtain allowance of two registrations that include those words without a disclaimer. As mentioned, Applicant owns Registration No. 5470704 for the mark GUARANTEED RATE AFFINITY (in standard character form) and Registration No. 5470770 for the mark GUARANTEED RATE AFFINITY and design, reproduced below, both for mortgage lending services registered with a claim of acquired distinctiveness-in-part under Section 2(f) of the Trademark Act as to "Guaranteed Rate."



The same examining attorney (not the examining attorney in this case) approved for publication both registrations on May 15, 2018 without requiring a disclaimer of "guaranteed rate." Trademark Rule 2.41(a), 37 C.F.R. § 2.41(a), provides that

> [i]n appropriate cases, ownership of one or more active prior registrations on the Principal Register or under the Trademark Act of 1905 of the same mark may be accepted as prima facie evidence of distinctiveness if the goods or services are sufficiently similar to the goods or services in the application; however, further evidence may be required.

We find that Applicant's prior registrations are not sufficient to prove that GUARANTEED RATE has acquired distinctiveness. Additional evidence is required for this purpose for two reasons. First, we find that the term GUARANTEED RATE is so highly descriptive that we find reliance on prior registrations insufficient, in and of itself, to demonstrate acquired distinctiveness. Trademark Rule 2.41(a)(1),

37 C.F.R. § 2.41(a)(1) ("In appropriate cases, ownership of one or more active prior registrations on the Principal Register … of the same mark may be accepted as prima facie evidence of distinctiveness …; however, further evidence may be required."). *See also In re Loew's Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865, 869 (Fed. Cir. 1985) (finding claim of ownership of a prior registration insufficient to establish acquired distinctiveness where registration was refused as primarily geographically deceptively misdescriptive); *Milwaukee Elec. Tool Corp. v. Freud Am., Inc.*, 2019 USPQ2d 460354, *22 (TTAB 2019) ("Freud's reliance on the '769 registration does not preclude Milwaukee from establishing that the mark is so non-distinctive (*i.e.*, common) that a prior registration for the same mark for similar goods is insufficient to establish acquired distinctiveness."), *complaint filed*, No. 20-cv-109 (M.D.N.C. Feb. 3, 2020); *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1234 (TTAB 2014) (prior registration alone not sufficient to establish acquired distinctiveness in highly descriptive term), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016).

> ... [E]ach application for registration of a mark for particular goods must be separately evaluated. Nothing in the statute provides a right *ipso facto* to register a mark for additional goods when items are added to a company's line or substituted for other goods covered by a registration. Nor do the PTO rules afford any greater rights. Under Rule 2.41(b), in appropriate cases, a prior registration on the Principal Register for the same mark "may" be accepted as "evidence" of distinctiveness, but the same rule reserves to the PTO discretion to require additional proof.

*Loew's Theatres*, 226 USPQ at 869; *see also Cordua*, 823 F.3d at 600, 118 USPQ2d at 1635 ("The PTO is required to examine all trademark applications for compliance with each and every eligibility requirement, . . . even if the PTO earlier mistakenly

registered a similar or identical mark suffering the same defect."). Indeed, the existence of these two registrations without disclaimers of "Guaranteed Rate" are insignificant in the mix of evidence in this particular set of circumstances.

Second, because Applicant's prior marks have not been registered for five years, a competitor could challenge the registrations on the ground that GUARANTEED RATE is merely descriptive and has not acquired distinctiveness. Therefore, our holding here that GUARANTEED RATE has not acquired distinctiveness is not a collateral attack on the validity of those registrations. *Compare In re Am. Sail Training Ass'n*, 230 USPQ 879, 880 (TTAB 1986), where the Board held that an examining attorney may not require a disclaimer of TALL SHIPS in an application for registration of the mark RETURN OF THE TALL SHIPS, where applicant owns an incontestable registration for the mark TALL SHIPS covering identical services.

Requiring proof that an applicant has been effective in its efforts to sway public perception from primarily viewing a term in its ordinary descriptive sense to instead primarily signifying a brand[49] works hand-in-hand with the corollary that "our society is better served if … highly descriptive or generic terms remain available for use among competitors." *In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 91 (CCPA 1980) (footnote omitted). *See also In re Abcor Dev. Corp.*, 588 F.2d 811, 813, 200 USPQ 215, 217 (CCPA 1978) ("The major reasons for not protecting [descriptive]

---

[49] *See, e.g., Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1480 (TTAB 2016) ("The ultimate test in determining whether a designation has acquired distinctiveness is Applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source.").

marks are: (1) to prevent the owner of a mark from inhibiting competition in the sale of particular goods; and (2) to maintain freedom of the public to use the language involved, thus avoiding the possibility of harassing infringement suits by the registrant against others who use the mark when advertising or describing their own products.") (citation omitted). The record in this case reflects that, notwithstanding Applicant's substantial efforts, the public, including Applicant's competitors, still primarily use and understand the term "guaranteed rate" to describe a feature of mortgage lending services.

Considering the record in its entirety, Applicant has not met its burden to establish acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), as to the highly descriptive wording GUARANTEED RATE.

In view of our affirmance of the refusals to register under Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1), and lack of acquired distinctiveness, we do not reach the Examining Attorney's alternative grounds for refusing to register Applicant's marks as failing to function as marks (because they are merely informational) under Trademark Act Sections 1, 2, 3, and 45, 15 U.S.C. §§ 1051-1053, 1127.

**Decision**: The refusal to register application Serial No. 87054820 for the mark GUARANTEED RATE in standard character form based on mere descriptiveness and lack of acquired distinctiveness is affirmed.

The refusal to register application Serial No. 87054849 for the mark GUARANTEED RATE and design based on mere descriptiveness and lack of acquired distinctiveness is affirmed. However, in the event that Applicant submits the

required disclaimer within thirty days from the date of this decision, the requirement for the disclaimer will have been met and the application will proceed.[50] Trademark Rule 2.142(g), 37 C.F.R. § 2.142(g).

---

[50] A proper disclaimer reads as follows: "No claim is made to the exclusive right to use of Guaranteed Rate apart from the mark as shown."